Jones, Chief Judge,
delivered the opinion of the court:
This is a suit for the excess cost of sugar which plaintiff purchased and which plaintiff claims defendant had agreed to furnish at a stipulated price.
The case is before us pursuant to the terms of a special act of Congress conferring on this court the right to hear, determine and render judgment on the claim. (Private Law 874, 81st Congress, 2d Session, approved August 28, 1950.) [64 Stat. A 195.]
Plaintiff, a native of Iran, immigrated to this country on a permanent resident quota basis in 1946, and shortly thereafter filed application to become a naturalized citizen.
In November 1942 plaintiff was engaged in the contracting business in Iran. On November 14, 1942, he entered into an agreement with the defendant which at the beginning recited:
This agreement is made until a proper form of contract can be set up and executed. Its terms shall be as binding as those on the properly executed forms.
By the terms of the agreement the contractor was to construct certain buildings and to furnish all labor, equipment and material in connection therewith, less items listed to be furnished by the United States Government.
The agreement contained the following provision:
The Contracting Officer agrees to furnish the Contractor with rations for his workmen consisting of 1% lb of flour, 2 ozs sugar and y3 oz of tea for each workman for one day at a cost of two (2) rials per ration, to be paid by the Contractor when demanded by the U. S. Government or to be deducted from payments made to the Contractor.
The formal contract covering the work called for by the above-mentioned agreement was executed November 22,1942. The work was to begin November 26,1942, and be completed March 18,1943.
By the terms of the contract of November 22, 1942, the plaintiff was to furnish the tools, labor, food, housing and incidentals without further cost to the United States.
*795 The provision quoted in the agreement as to items to be furnished by the contracting officer was not included in the formal contract.
The work was completed in a satisfactory manner, within the time specified, as extended.
Plaintiff on August 1, 1944, signed a release of all claims, except for the failure of the defendant to furnish the sugar for a part of the period.
Working conditions in Iran were very different from those prevailing in the United States. In that country contractors in general not only paid wages, but workers were furnished food and shelter. Three'staple foods usually furnished were flour, sugar and tea, otherwise workers could not be procured.
Because of this practice the defendant’s contracting officer adopted the practice, which had been established by the British and others, of inserting in the contract a clause similar to the one in the preliminary agreement, under which the contracting officer would supply these articles. The provisions of the agreement were in accord with this practice in connection with these scarce articles which were not readily obtainable in Iran. The price stated was substantially less than the price in the open market in that area.
Throughout the work the defendant furnished the specified flour and tea called for in the preliminary agreement and also furnished the sugar, except for a period of about three months in the middle of the contract.
The practice followed was to have the contractor estimate the number of laborers he would have in the next one or two weeks. The contractor would then issue a certificate setting out the rations plaintiff was entitled to receive. The plaintiff would then take the certificate to the warehouse and secure the commodity.
In the early part of December 1942 the supply of sugar in the warehouse became low. When the plaintiff presented his certificate the defendant’s employee in charge of the warehouse told plaintiff that because of the shortage he would be unable to supply the sugar. During the remaining parts of December and through January and February of the following year, the other two commodities, flour and tea, were fur *796 nislied, but the sugar was not. In March 1943 as soon as the warehouse supply was replenished, the supplying of sugar was resumed and continued during the remainder of the contract period.
Plaintiff protested to the contracting officer as soon as the certificate was not honored. The contracting officer expressed regret, but stated it was merely a problem of supply and that as soon as it was available he would furnish the sugar to plaintiff. For the period of the contract the amount of allowable sugar was 14,218.7 pounds short. This amount was never furnished. The full quotas of flour and tea were furnished.
Plaintiff purchased the sugar in the open market at the best price obtainable, which was an aggregate of $10,033.26 above what it would have cost under the terms of the agreement.
In making payment to plaintiff the defendant computed and deducted the price of the sugar, including the 14,218.7 pounds which were never furnished by the defendant, but the plaintiff was later reimbursed for this;
Plaintiff before acceptance and final settlement made demand for a replacement in kind. A reduced offer was made him, but this was rejected.
The defendant insists that since the formal contract provided that the contractor “shall furnish all tools, labor, housing or shelter and food for laborers,” that it was not obligated to furnish the sugar, and that the original temporary agreement was merged in the formal contract.
The plaintiff insists that the preliminary agreement and formal contract should be construed together; that the agreement included a provision that “its terms shall be as binding as those on the properly executed forms”; that they are not inconsistent and that the custom of the country and the conduct of the parties proves the interpretation for which plaintiff contends.
There can be no doubt that ordinarily all preliminary negotiations are merged in the final contract when that simple issue is presented. But that is not the situation here;
We think plaintiff should recover.
*797 It had been the established custom of British and other contractors operating in Iran to supply the scarce commodities of flour, tea and sugar. Iranian laborers were unwilling to work unless they were furnished these foods. The agreement stipulated that everything should be furnished by the contractor except the three listed items of food, which manifestly was not all the food that was used. While this specific provision was not in the formal contract, the contracting officer had advised plaintiff that the stipulated rations of these three staple commodities would be supplied by the defendant. The bid was made on that basis. These items were supplied by the defendant at the specified rate both before and after the signing of the formal contract. The lapse came after the formal contract was in full operation. Even during that period the contracting officer issued certificates calling for supplying the sugar. The other listed items, flour and tea, which had exactly the same status, were supplied throughout the contract. Even during the period when sugar was not furnished certificates were issued and the stipulated price of the sugar, even though not actually furnished, was deducted from the contract price. The contracting officer corroborated plaintiff’s position.
We quote from Old Colony Trust Co. v. Omaha, 230 U. S. 100, at page 118, the following:
Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence. Chicago v. Sheldon, 9 Wall. 50, 54; Insurance Co. v. Dutcher, 95 U. S. 269, 273; District of Columbia v. Gallaher, 124 U. S. 505, 510.
In Insurance Company v. Dutcher, 95 U. S. 269, at page 273, is found the following language:
The practical interpretation of an agreement by a party to it is always a consideration of great weight. The construction of a contract is as much a part of it as any thing else. There is no surer way to find out what parties meant, than to see what they have done.
In this connection Williston comments:
The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by *798 the court, and to this end not only the acts but the declarations of the parties may be considered. But if the meaning of the contract is plain, the acts of the parties cannot prove an interpretation contrary to the plain meaning. Such conduct of the parties, however, may be evidence of a subsequent modification of their contract. {Williston on Gontraots, Section 6%3. Secondary rules: An interpretation given by the parties themselves will be favored.]
In the light of the entire record, the conduct of the parties, and the action taken by all of those having a part in the negotiation and carrying out of the contract, it is impossible to reach any other reasonable conclusion than that plaintiff is entitled to recover.
Plaintiff will be given judgment for $10,033.26.
It is so ordered.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The coui’t, upon the evidence, the report of Commissioner Richard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a native of Iran who was formerly a resident of Tehran, Iran. He immigrated to the United States on a permanent resident quota in 1946. Shortly after his arrival in the United States, he took out his first naturalization papers. At the time he testified in this proceeding in February 1951, the five-year period of time necessary for him to become a naturalized citizen had not expired. He now resides in the State of New York.
The plaintiff’s name is A. K. Chahroudi. In his native country of Iran, he spelled his surname Shahroody. In November 1942 he was engaged in the contracting business in Iran and trading as an individual under the name of A. K. Shahroody & Co. He attended school in France and later in England in which latter country he was graduated from the University of London as a civil engineer.
2. Subsequent to the filing of the original petition in which the plaintiff alleged that this court had jurisdiction *799 to consider his claim even though he was a foreign subject, the Congress enacted and there was approved on August 28, 1950 (Private Law 874,81st Cong., 2d sess.), an act to confer jurisdiction on this court “to hear, determine, and render judgment upon the claim of A. K. Chahroudi, a subject of Iran, now a permanent resident of the United States, growing out of an alleged breach by the United States of war construction contract numbered W-512-eng-7, dated November 22,1942”. Thereafter the jurisdiction of this court was invoked by means of an amended petition.
3. On November 14, 1942, the plaintiff, after the acceptance of his bid by the defendant, entered into an agreement with the defendant which stated at the beginning thereof—
This agreement is made until a proper form of contract can be set up and executed. Its terms shall be as binding as those on the properly executed forms.
The agreement further provided:
A. K. Shahroody & Co., hereinafter termed “The Contractor” agrees to furnish all labor, equipment and material (less items listed below to be furnished by the U. S. Government), to construct the following list of buildings in the areas and locations shown on attached sketch: [Then followed the buildings to be constructed and the basis of payment therefor].
‡ # * ifc ifc
The Contracting Officer agrees to furnish the Contractor with rations for his workmen consisting of 1% lb of flour, 2 ozs sugar and y3 oz of tea for each workman for one day at a cost of two (2) rials per ration, to be paid by the Contractor when demanded by the U. S. Government or to be deducted from payments made to the Contractor.
* * * * *
4. On November 22,1942, the formal contract No. W-512eng-7 covering the work called for by the agreement of November 14, 1942, was executed by the plaintiff and by the defendant represented by the same contracting officer who signed the previous agreement. The formal contract provided that the plaintiff was to furnish materials and perform the work for the construction of the buildings in accordance with specifications, schedules, and drawings at *800 tached. The work was to be commenced on November 26, 1942, and to be completed March 18,1943. The plaintiff was to be paid on a unit price basis at an estimated cost of $271,840.93.
5. The specifications which were attached to and made a part of the formal contract contained the following provisions:
Art. 4. Contractor's Plant:
The Contractor shall furnish all tools, labor, housing or shelter and food for laborers and all other incidental requirements at his own expense without further obligation on .the part of the United States Army, Persian Gulf Service Command.
Art. 6. Payments:
Payments will be made to the Contractor for the amount of work completed every two (2) weeks, based on the Contracting Officer’s estimate at the contract unit prices, except that 10% of the estimated cost will be retained by the U. S. Army, P. G. S. C., until completion of the entire contract to the satisfaction of the Contracting Officer.
It is understood that contract prices cover the use of all tools, the furnishing of all labor, housing, and feeding for same, and all incidentals necessary for the completion of the work in accordance with these specifications and the requirements of the Contracting Officer.
The bid sheet attached to the contract of November 22, 1942, and made a part of the contract in Article 24 thereof, contained the following provision:
The foregoing bids include all cost of furnishing the necessary tools and labor, food and housing of [or] shelter for labor, and all other incidentals including insurance covering contractor liability required for the satisfactory completion of the work in accordance with the requirements of the specification and the contracting officer, without further costs to the United States Army.
6. The provision in the agreement of November 14, 1942, heretofore set out in finding 3, with respect to the obligation of the contracting officer to furnish the plaintiff with rations for his workmen consisting of flour, sugar and tea at a cost to the plaintiff of two rials per ration was not included in the formal contract of November 22,1942.
*801 7. The contract was satisfactorily completed by the plaintiff “within the original time limit (or extensions thereto)”, the greater part of the work thereunder having been performed during the period from shortly after the date of the preliminary agreement, November 14, 1942, to about April 1943. On August 1,1944, the plaintiff signed a release of all claims under the contract except a claim pertaining to the failure of the defendant to furnish the sugar component of the ration referred to in finding 3.
8. Working conditions in Iran are considerably different from those prevailing in the United States. In that country contractors in general recruited their laborers and not only paid them wages but also furnished them food and shelter. Under such circumstances the cost of food and shelter became items of cost to a contractor in performing his work. Three staple foods which were commonly furnished by contractors to the laborers at the time of the execution of the contract involved in this suit were flour, sugar, and tea. At that time these were scarce commodities which were not readily procurable. Iranian laborers were unwilling to work unless they were furnished with these foods. Because of the scarcity of these staple food commodities, the defendant’s contracting officers adopted the practice which had been established by the British and others of inserting a clause in their contracts similar to that referred to in finding 3, under which the contracting officers were obligated to furnish these items to the contractors. The insertion of the provision with respect to rations in the agreement of November 14, 1942, was in accordance with that practice and the price stated was substantially less than the plaintiff would have had to pay for such items in the open market when they could be obtained. While the provision in regard to rations was not included in the formal contract, the defendant’s contracting officers and others concerned dealt, as will hereinafter appear, with the situation as if it had been so included.
9. The plaintiff began the work called for by the contract on or shortly after the date of the execution of the preliminary agreement on November 14, 1942. Throughout the work under the contract the defendant furnished to the plaintiff two of the ration components, namely, flour and *802 tea; and also furnished sugar, as called for by the provision in the preliminary agreement, for the entire period of the contract except a period of approximately three months beginning about December 1,1942.
The practice followed by the plaintiff in the performance of his contract to secure rations was for the plaintiff to estimate the number of laborers he expected to have working over the next one or two weeks and submit that estimate to the contracting officer who would issue a certificate setting out the rations the plaintiff was entitled to receive. The plaintiff would then take this certificate to defendant’s warehouse from which the rations were issued. During the early part of December 1942, the defendant’s supply of sugar in its warehouse became low. As a result, when the plaintiff presented his certificate at the warehouse, which had been furnished him by the contracting officer, the defendant’s employee in charge of the warehouse told the plaintiff that because of the shortage he would be unable to supply the sugar, and no sugar was supplied to the plaintiff. During substantially all of December 1942 and January and February 1943, the other two components (flour and tea) were supplied as authorized by the certificates during that period but no sugar was furnished. About March 1943, as soon as the supply of sugar in defendant’s warehouse became available, defendant resumed the issuance of sugar along with the other rations and continued that practice to the end of the contract. However, the amount issued during the remainder of the period was in substance only the amount required for the remaining period and (except for a small quantity for which allowance was made in the computations which appear in succeeding findings) did not take the place of any sugar which was required during the period December to February, inclusive, when the sugar was not available.
10. The plaintiff protested to the contracting officer when he failed to secure sugar, as shown in the preceding finding, and in reply to that protest the contracting officer expressed his regret at not being able to furnish the sugar, but stated that it was merely a problem of supply over which he had no control and that as soon as sugar was available he would furnish it to him. On the basis of the provisions of the pre *803 liminary agreement of November 14, 1942, with, respect to the furnishing of rations (see finding 3), the plaintiff was entitled to receive 142,050 rations during his operations under the contract, of which sugar amounted to two ounces per ration. Tea and flour were furnished as required and sugar to the extent of 3,537.5 pounds, whereas the allowable sugar was 17,756.2 pounds, i. e., a shortage of 14,218.7 pounds which was never furnished by the defendant.
11. When the plaintiff was unable to secure sugar from the contracting officer for use by his laborers for the approximate period December 1942 to February 1943, inclusive, the plaintiff purchased sugar in the open market at the lowest prices obtainable in that area as follows:
Bate 10-9-21 14- 9-21 25-9-21 9-10-21 17-10-21 23-10-21 30-10-21 9-11-21 15- 11-21 20-11-21 1-12-21 6-12-21 Bate 1 Dec. 1942 5 Dec. 1942 16 Deo. 1942 30 Dee. 1942 7 Jan. 1843 13 Jan. 1943 20 Jan. 1943 29 Jan. 1943 4 Feb. 1943 15 Feb.1943 20 Feb.1943 27 Feb.1943 Kgs. 503.50 496.50 499.60 503.00 498.60 1,001.00 797.50 1,002.00 495.50 603.00 492.00 6,792.10 Price (Els. per kilo) 37/00 40/— 43/-47/-48/60 68/50 68/— 71/50 73/— 75/-77/— Rials 18,629/50 19,860/— 21,478/60 23,641/— 24,183/10 58,558/50 54,230/— 71,643/— 36,171/50 37,726/— 38,192/— 404,312/10
Prior to the making of each of the above purchases the plaintiff estimated the number of laborers he would have on the job for a week and on the basis thereof made requests on the contracting officer for the rations required for his laborers for that period. Pursuant to that request, the contracting officer issued to the plaintiff certificates showing the rations to which the plaintiff was entitled. When the plaintiff presented those certificates to the defendant’s representative in charge of the warehouse from which he had been obtaining his rations and failed to secure the sugar called for by the certificates, the plaintiff made the purchases set out above which were in the approximate amounts called for by the certificates. Upon receipt of the sugar so purchased, the plaintiff issued it as rations to his laborers on the contract involved in this proceeding.
*804 12. Although the defendant did not supply all of the sugar component of the 142,050 rations called for by the preliminary agreement of November 14,1942, the defendant in computing the payments due the plaintiff under the contract withheld the sum of two rials for each of the 142,050 rations. Since the sugar component of each ration was 2 ounces, the total amount deducted on account of the sugar was 17,756.2 pounds. However, as heretofore shown, since the defendant furnished only 3,537.5 pounds of sugar, deductions were made from payments on account of 14,218.7 pounds which were never furnished to the plaintiff.
13. The purchases of sugar, as shown in finding 11, of 6,792.1 kilos, represented 14,973.86 pounds which was 755.16 pounds in excess of the shortage of 14,218.7 pounds, referred to in the preceding finding, due the plaintiff under the terms of the preliminary agreement of November 14, 1942. That overpurchase, when reduced to kilos, amounted to 342.5 kilos. As heretofore shown, the total amount paid for the purchases referred to in finding 11 was 404,312.1 rials. At 77 rials per kilo, the highest price paid for any of the purchases, the overpurchase amounted to 26,372.5 rials, and when that amount is deducted from the total amount paid, a net cost is determined for the sugar purchased by the plaintiff, which was required for use by his laborers under the contract, of 377,939.6 rials. During the period of these purchases, the prevailing rate of exchange was 32 rials per United States dollar. At this rate of exchange, the net cost of sugar purchased by the plaintiff was the sum of $11,810.60.
14. Before acceptance and final settlement under the contract, the plaintiff made demand upon the United States Commanding Officer of the Persian Gulf Service Command for a replacement in kind of the sugar which the plaintiff had purchased. In response to that claim the plaintiff was advised on October 25,1943, in part as follows:
You are hereby advised that the Foreign Claims Commission of this Command has considered your claim and will allow you compensation upon the basis of one-half (Y2) Rial per sugar ration which was not delivered to *805 you under the above agreement of 14 November 1942, and for which deduction was made against your account.
You are accordingly advised that you have been awarded the sum of Rials 29,152 damages sustained from failure to make delivery of sugar ration under the above contract.
The plaintiff rejected the award as made by the above communication. On December 6, 1948, the Foreign Claims Commission of the Persian Gulf Service Command issued its “Findings and Award” in which it held that the plaintiff was entitled to damages of 56,875 rials under the agreement of November 14, 1942, on account of the failure to furnish sugar rations. That award was affirmed by the Comptroller General on January 2, 1947, who forwarded to the plaintiff a check in the amount thereof, $1,777.34 (56,875 rials at 32 rials per United States dollar). That award was likewise unsatisfactory to the plaintiff who returned the check to the defendant by letter dated January 22, 1947. Upon further consideration, the Comptroller General, by letter dated April 3,1947, affirmed his previous action, returned the check, and advised the plaintiff that the check could be cashed without prejudice to his right to assert a claim for such further amount as he might consider due. Thereafter the plaintiff cashed the check.
After giving credit for the amount of $1,777.34 against the net cost of sugar purchased by the plaintiff of $11,810.60, as shown in finding 13, there remains an amount of $10,033.26 claimed by plaintiff in this proceeding.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the defendant ten thousand thirty-three dollars and twenty-sis cents ($10,033.26).