Per Curiam :
This case was referred to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on February 24, 1966. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by the plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and the petition is dismissed.
OPINION OR COMMISSIONER*
Maletz, Commissioner:
In this action review is sought through an assignment of errors of a decision by the Corps of Engineers Board of Contract Appeals (No. 2223) denying a contractor’s claim to an equitable adjustment under the Changes clause of the contract for remedial work the government required it to perform on certain lock gates for a dam project.
The case arises as follows: Plaintiff had a contract with the Army Corps of Engineers under which it was required to furnish and install four lock gates at the New Cumberland Locks and Dam project on the Ohio River at Stratton, Ohio. The fabrication of the gates was subcontracted to a firm in New Orleans and a government shop inspector was assigned to inspect the gates at the plant as they were being built. Upon completion of fabrication, the government inspector accepted the gates for shipment to the job site at Stratton, Ohio. After the gates arrived there, it was found that they had many fabrication deficiencies of a nature necessitating *886 substantial remedial work, which work the plaintiff performed pursuant to the contracting officer’s directive. Later, to avoid assessment of liquidated damages, plaintiff sought a time extension because of the delay caused by the corrective work. The Corps of Engineers Board of Contract Appeals (No. 1709) allowed the claim, holding that the delay was attributable to a combination of the subcontractor’s faulty fabrication and the government’s poor inspection at New Orleans, and that the delay was thus an excusable one under Article 5(c) of the contract.[1] The Board also considered whether plaintiff was entitled to a time extension under the Changes article and determined it was not. As to this, it pointed out that Article 9(d) of the contract (which is reproduced below at page 899) makes inspection at the place of production final with certain exceptions; that the pertinent exceptions were “latent defects” and “departures from specific requirements of the contract”; and that the defects in the gate components were patent, not latent. The Board concluded, however, that the fabrication defects constituted “departures from specific requirements of the contract” on the ground that they were “of such gravity and extent that it would not be reasonable for * * * [plaintiff], or its fabricator, to conclude that their waiver would be within the authority of the inspector.” From this, the Board concluded that “there never was such an acceptance of the gates as would relieve * * * [plaintiff] of the duty to correct defects on account of faulty fabrication”; and that “[b]ased upon the above considerations, and since * * * [plaintiff’s] proof fails to establish that Government site personnel required any work beyond that necessary to correct fabrication deficiencies, * * * [plaintiff] is not entitled to relief by way of an equitable adjustment in contract time under the Changes article of its contract.”
Subsequent to this Board decision in No. 1709, plaintiff sought an equitable adjustment under the Changes article because of the remedial work it performed on the lock gates. *887 The Corps of Engineers Board of Contract Appeals (No. 2223) denied the claim [2] on the ground that the Article 9 (d) finality rule was not applicable since there were “departures from specific requirements of the contract” within the meaning of that article. In the Board’s words “* * * a departure results where the components are so poorly worked that they cannot, in the condition they are in, be fit together and erected into gates. This was the situation here. In our view, the exceptive phrase does extend to those matters which are recognized as not being left to an inspector’s discretion and judgment.”[3]
Plaintiff argues here that under the contract final acceptance of the gates was to be at the place of production; that the Board’s interpretation of the exceptive phrase in Article 9(d) “departures from specific requirements of the contract” was incorrect as a matter of law; and that in any event the Board’s application of the exception was arbitrary and capricious in that it refused to give any finality to the acceptance in New Orleans, made no attempt to segregate the corrective work which was required for fit and/or operation from the corrective work that was required for other reasons, and refused to give the plaintiff the opportunity before the contracting officer to show which of its corrective work was unrelated to the “departures found by the Board.” Plaintiff further maintains that, in any case, the Board’s factual determination that the gates, as fabricated, could not be fit together and operated was not supported by substantial evidence. Defendant’s principal contentions, on the other hand, are that the contract as a whole establishes that final acceptance of the gates was to be at the job site; that the Board’s action relative to the exceptive phrase in Article 9(d) (“departures from specific requirements of the contract”) was correct in fact and law; that the Board’s utilization of that exceptive phrase was not arbitrary and *888 capricious; and that the Board’s findings are entitled to finality.
We turn then to the facts of the case as shown in the record before the Board.[4] In October 1955, the Savin Construction Corporation[5] entered into a contract in the estimated amount of $16,312,765 with the Pittsburgh District of the Army Corps of Engineers for the construction of locks at the New Cumberland Locks and Dam project on the Ohio Liver near Stratton, Ohio. One of the items in the contract called for the furnishing and installing of lock gates which were to consist of two upper and two lower gates, with each gate to have two leaves. In November 1955, plaintiff subcontracted the fabrication of the gates to Higgins, Inc. of New Orleans, Louisiana, for a lump sum price of $453,000, and subcontracted the erection of the gates to Penn-Southern Construction Company of Pittsburgh, Pennsylvania. The subcontract to Higgins was in the form of a purchase order which excepted field sandblasting from the scope of the work; specified that the gate leaves were to be fabricated in three vertical sections and match marked for field erection; and provided that “all materials and workmanship * * * [were] subject to Government inspection and approval”; and that “[f]inal payment * * * [was to be] within 30 days of approval of * * * [the gates] by the Corps of Engineers.” Higgins acknowledged the purchase order in December 1955 and requested that plaintiff agree to final acceptance of the gates at its plant in New Orleans rather than at the job site in 'Stratton, Ohio. Am official of plaintiff replied that “As to 100% acceptance of this work at your plant, I believe the Corps of Engineers will only give an acceptance under certain conditions; that they are made as specified and they will receive them with a waiver until final acceptance when the gates are installed for operation.” Subsequently, plaintiff advised Higgins that it would accept the gates upon delivery to the job site.
*889 Pursuant to a requisition by the Pittsburgh District of the Corps of Engineers, the New Orleans District provided shop inspection services for the fabrication work at the Higgins plant and assigned R. A. Jackson, a marine equipment inspector, for that purpose. At an early date, Jackson told the then president of Higgins that regardless of any agreement between his company and plaintiff, he (Jackson) had no authority to make a final acceptance at the Higgins plant and that .the final acceptance would take place when the gates were erected at the job site.
Jackson spent approximately two hours a day during the period of fabrication inspecting the gates, the rest of his time being devoted to other projects. The scope of his inspection at the Higgins plant included dimensions, alignment, match marking, assembly and disassembly of the gates. Jackson satisfied himself during his inspection that in all these respects the gates were satisfactory and in accordance with contract requirements. To the extent that he was able, he also inspected with respect to the welding. For instance, from time to time he would obtain the names of the welders and check to see if they were properly certified. In every case he found that they were. But a great deal of the welding was accomplished in Jackson’s absence, partly because he was there only a portion of the day and partly because considerable welding was done on a late shift. Welding inspection was further limited by the fact that Higgins’ representatives did not clean flux from the welds because they contended that the exception of sandblasting in their purchase order with plaintiff relieved Higgins of this responsibility. In order to overcome this problem, Jackson chipped away the flux in a number of places. He estimated that between the welding he exposed in this manner and welding exposed from other causes, he managed to inspect 10 percent of the total welding on the gates, which was estimated to be 165,000 linear feet. Tire effectiveness of Jackson’s inspection may also have been limited by the magnitude of the job. There were 8 leaves .to the gates and 1 maj or pieces to each leaf, making 56 major sections — and all told there were about 30,000 pieces, counting small parts.
*890 Throughout his inspection, whenever Jackson found work he considered unsatisfactory, he required that it be re-done. For instance, some of the welding had to be done over, diaphragms or members that were not properly aligned were straightened, and some machine work was corrected. It was Jackson’s opinion at the Board hearing, based on his inspection at the Higgins plant and a subsequent view of the gates while stored at the job site, that with the exception of a few minor items of no great importance, the gates were fabricated by Higgins satisfactorily and in accordance with plans and specifications. A Higgins superintendent and a Higgins inspector gave testimony supporting Jackson’s conclusion on the conditions of the gates as fabricated.
Although invited to visit .the Higgins plant to observe fabrication, plaintiff’s personnel did not do so. As regards inspection, plaintiff’s representative testified that plaintiff did not inspect during fabrication because it relied on the government inspection and that this was in accordance with practice in. the construction industry. Although it is also customary for the erector to be invited to visit a manufacturer’s plant during fabrication of a major item such as these gates, Penn-Southern was never invited to visit the plant, and thus its personnel did not see the gates until they arrived at the job site.
The lower gates were shipped to the job site by barge on October 14, 1957, the upper gates on October 18, 1957.[6] Due to Jackson’s being on leave on the latter date, another government inspector, Wright G. James, was present for loading of the upper gates. He considered that the gates were properly loaded and noted no major defects therein. Jackson (in the case of the lower gates) and James (in the case of the upper gates) signed forms DD 250-3 entitled “Sub-Order Material Inspection Memorandum”, indicating that the gates had been inspected on October 4, 1957. Under the applicable Armed Services Procurement Regulations, the execution of these forms signified that the gates had been inspected *891 and accepted as conforming with contract requirements. 32 C.F.R. (Rev. 1954, cum. supp. 1960) Part 14 § 14.201. See also Gordon H. Ball, Inc., ASBCA No. 8316, 1963 BCA 19,467, 19,477.[7]
The barges arrived at the job site the first part of November. Personnel of the erector, Penn-Southern, were concerned because of the appearance of the material as it lay in the barges and refused to unload the gates from the barges until plaintiff was advised of their condition since they felt that remedial work would be required before erection. This brought on conferences among representatives of plaintiff, Higgins and Penn-Southern, the result of which was that Higgins gave assurance that it would stand behind the gates. Thereupon, Penn-Southern agreed to unload the gates, putting plaintiff on notice by letter, however, that some of the fabricated sections were in poor condition and did not meet specifications, and that their unloading did not constitute acceptance. Penn-Southern then unloaded the gate sections and parts from the barges and stored them at the j ob site in an area referred to as the brickyard. At this time, in early November 1957, no one involved — either from the government, plaintiff, Higgins or Penn-Southern — made any attempt to assess the precise extent of deficiencies in the gate parts. Nor at that time did any one suspect the true magnitude of the problems that later developed though all concerned noted at the time of unloading that the edges of the skin-plate sections were wavy rather than straight, that there was some misalignment, and that some of the diagonal bars were bent.
Furnishing and installation of the gates were to be paid for under Item 22 of the contract. This item was broken down for contract administration purposes in such a way that 60 per cent would be paid upon delivery to the job and the other 40 per cent upon installation and acceptance. Plaintiff was given credit for 60 per cent (in other words *892 full credit for delivery to the job) on Item 22 on the November 1957 payment estimate. The government resident engineer raised no question as to the propriety of giving full credit for the delivery of the gates — in spite of the deficiencies — because the documents showing shipment from New Orleans were in order, 40 per cent was still to be earned for erection of the gates, and 10 per cent (approximately $800,000 at that time) was being retained from the total contract earnings.
In connection with Higgins’ demand for final payment for the gates, plaintiffs project manager wrote on December 18, 1957:
As noted in our P.O. #2, (for fabrication of the gates) final payment is to be made “within 80 days of approval of items 22a and 22b by the Corps of Engineers,” the intent being approval by the Corps of Engineers here. As further noted in our letter of November 5, the condition of the delivered gates was the cause of some apprehension to us and the Corps of Engineers as to the difficulties which may arise during gate erection. The Corps of Engineers approval can be only of the finished erected gates.
Your Mr. Nankin discussed the condition of the gates with our representatives here and in part allayed our fears concerning the condition of the gates. However, we feel that we should have your letter confirming that any- extra costs of erection which are necessary because extra cost will be bom by your, [sic]
There then followed an exchange of correspondence between plaintiff and Higgins which culminated in a letter dated February 4, 1958, in which Higgins agreed “to accept responsibility for inherent and latent defects, if any, in the gates, which defects * * * [plaintiff] would not have discovered through the use of due diligence in inspecting the gates at the time of receipt at the dam site.”
Meanwhile, because the job had not reached the stage of construction permitting erection of the gates, they had lain in the brickyard from November 1957 (when they were unloaded) to the following February. Plaintiff made no attempt during this time to eliminate defects from the gates, nor did the government request plaintiff to do so. This *893 inactivity appears to have been due to tire parties’ unawareness at that time of the seriousness of the problem. Toward the end of February 1958, government representatives turned their attention to the gates. On February 28, 1958, an inspection of the gates laying in the brickyard was made by personnel from the Pittsburgh District Office of the Corps of Engineers and the government resident engineer; another such inspection was made on March 17, 1958, at which time personnel from the New Orleans District, including Jackson, the government inspector, were in attendance; and a third inspection was made on March 20, 1958, primarily by government personnel responsible for design performance. The reports of these inspections showed an increasing concern by the government representatives with the seriousness of the problem which might be encountered during erection of the gates. However, possibly because all areas of the gates were not exposed as they lay on the ground, because only a short period of time was utilized to inspect on each occasion, because certain of the corrective work no doubt created distortions which in turn required correction, and because certain deficiencies were of such nature as not to become apparent until erection was attempted, the various government representatives were still not aware at that time that as extensive remedial work as later was accomplished would be required.
The condition of the gates, however, was considered to be of sufficient seriousness to prompt the contracting officer on April 2, 1958 to write plaintiff as follows:
The lock gate sections stored at the job site have been observed by representatives of this office. While it is our position that final acceptance of the gates will be made only when erection has been completed, a number of deficiencies which must be corrected before erection starts have been observed. Some of these deficiencies are listed below:
a. Skin Plate Sections
Many portions of the girder flanges are not flat, and there is not full contact between the skin plate and the girder flanges. This condition makes the fillet welds between the flanges and the skin plates of questionable value.
*894 Much of the hand welding shows undercutting, skips, craters, slag inclusions, porosity and lack of fusion. This welding requires corrective work.
Unsupported edges of skin plates are very wavy and there are a number of short radius bends in these edges. These edges when assembled will not be permitted to vary from true surface by more than one quarter of an inch.
b. Girders
Flange distortion is similar to that described under a. above. Corrective welding is necessary. Several diaphragms are not centered on flanges.
c. Tension Bars for Gate Diagonals
Many of the bars have slight long radius bends, several have pronounced short radius bends and at least one bar has a twist within itself. Eepair of these defects must not impair the strength of the bars.
Butt welds in many of these bars will require additional work in order to assure a weld equal in cross-sectional area to the bar.
All work on these bars should be done prior to the radiographic tests proposed by this office.
d. Quoin and Miter Posts
The miter seal guide on one miter post presents a very wavy appearance. The reinforcing plate attached to the vertical web at the lower ten feet of the miter post does not have full bearing on the web plate. The plate is open as much as %2 inch at the center and will not add the strength required in this area.
e. General
Weld spatter and weld flux will require removal before painting and may not be dislodged by sand blast cleaning. Some flame cut edges where appearance is a factor will require grinding.
_ As indicated above, this is not offered as a complete listing of corrective work necessary.
Upon receipt of this letter from the contracting officer, plaintiff engaged Penn-Southern to perform the corrective work on a cost-plus basis since the latter was an expert in steel fabrication and plaintiff was not. At Penn-Southern’s suggestion, plaintiff requested the government to assign a shop inspector to the project full time. The government agreed and assigned to the project Conway D. Deyton, an experienced shop inspector, who arrived at the site on April *895 11, 1958, and remained until the latter part of November of that year, when substantially all the corrective work was completed. Also on receipt of the contracting officer’s letter of April 2, plaintiff telephoned Higgins’ president for the purpose of passing on to his company the responsibility for the defective fabrication work. Higgins was informed that corrective work would commence on April 7, 1958, and that the government had agreed to assign a full-time shop inspector whose duty it would be to designate the items to be corrected and supervise the work done. Higgins agreed to send its representative to the project who would keep a log of the time and equipment used and a description of the various items of work performed daily, with that record to constitute a basis for the determination of the costs involved. Higgins, however, insisted that the presence of its representative would not constitute an admission of liability, to which reservation plaintiff agreed. The Higgins representative arrived at the project shortly thereafter and remained assigned to the project until early July 1958 when he was replaced by another Higgins engineer who remained until mid-August 1958. Plaintiff protested that his leaving at that time was premature because of the amount of remedial work remaining to be done.
As soon as the corrective work was started, it became apparent that it would be impractical to perform all corrective work in the brickyard before moving the gates to the lock site because such a procedure would delay erection. Plaintiff obtained authorization to do a portion of the corrective work during actual erection, which authorization was confirmed in an exchange of correspondence between plaintiff and the contracting officer. Plaintiff wrote on April 21, 1958, as follows :
In reference to the corrective measures which we are making to the Lock Miter Gates, we request permission to try the following procedure with the upper 600' chamber gates.
With the gate in its present dismantled state, we propose to confine the corrective work to straightening bent members and skin plate, welding the skin plate to the girders in the location where it properly should have been done, plug weld skin plate at the intersection of *896 girder and stiffeners, cleaning old welds, cutting into tbe stiffeners tbe missing dram boles, and building up undersized welds on tbe under side of the bottom girder in those locations which would not be easily accessible after erection.
We then plan to proceed with final erection. After it has been determined that the gate will properly fit together, the .balance of the corrective work, which consists chiefly of building up undersized welds to correct dimension will be completed.
Should we do the required welding on the dismantled gate, we fe,ar that sections would become warped which would complicate erection and possibly introduce undersized stresses.
It is with this thought in mind and the hope that our plan would not only expedite erection but also would yield a better corrective job that we make this request.
In the event that this procedure is determined proper by all parties concerned, we would continue in the same maimer with the other gates.
On June 2, 1958, the contracting officer wrote plaintiff as follows to confirm a relaxation in the procedure for accomplishing the corrective work which the government resident engineer 'had permitted:
The procedure outlined in your letter dated 21 April 1958 for accomplishing corrective work on the lock gates at the subject project has been reviewed.
I am primarily concerned that the finished gates will be acceptable. There is some doubt that acceptable gates can be obtained by the means which you propose since the information furnished does not permit an adequate appraisal of the probable results.
You have been permitted by the Besident Engineer to proceed with the work on the upper gates in the 600' lock as you proposed. No assurance was offered you however that the finished gates obtained by the methods outlined will be acceptable. Acceptability of the gates will be determined by inspection of the completed gates.
I observed the partial assembly of the land wall gate leaf at the upper end of the 600' chamber on 28 May 1958. While my position remains the same, that acceptable finished gates must be obtained, and that the methods used to obtain finished gates are for your determination, conditions observed on 28 May 1958 do not indicate that an acceptable gate is being produced.
I bring this to your attention so that you may reexamine the situation and take such action as you deem neces *897 sary to avoid undue loss of time in pursuing a course of action which does not produce satisfactory results.
The procedure followed in effecting the necessary corrective work was as follows: Deyton, the government shop inspector at the lock site, indicated the work which was to be done on the gates by making notations with chalk or keel on the metal such as “cut and fit”, “reweld”, “straighten”, etc. He would then come back later and see that his notations had been complied with. In addition to the work which Deyton marked, there was other remedial work where design considerations were present. For example, to bring some members into compliance with plans and specifications, it would have been necessary to tear them apart and completely refab-ricate them. Not only would this have been economically prohibitive, such total refabrication might have been harmful because of distortions introduced into the members. When confronted with this type of situation, the erector subcontractor would make proposals for deviations from specifications or plans to the design engineers of the Corps of Engineers Pittsburgh District. Discussions as to the adequacy of the deviations to meet the problem involved and not jeopardize the structural integrity of the gates would ensue and the erector would be permitted to proceed with the deviations, sometimes as modified during the discussions.
The corrective work required some 55,000 man hours, the magnitude of which is illustrated by the fact that the original fabrication work at New Orleans involved about 66,000 man hours. However, 'at no time during the performance of the corrective work was there a protest by the plaintiff, Penn-Southem or Higgins that the remedial work was unnecessary or excessive, or that the government was requiring anything beyond the requirement of the specifications. Nor at the hearing before the Board did plaintiff undertake to prove a single instance of specific work which Deyton or other government representatives required other than that necessary to make the gate components fit plans and specifications, except for the deviations proposed by Penn-Southern to overcome deficiencies.
The attitude of plaintiff while the remedial work was being done was that Higgins should be held responsible because *898 of the faulty fabrication. There may also have been some thought of recourse against the government because of the failure of the government’s New Orleans inspection to discover and report the poor fabrication, but there is no indication that it even occurred to plaintiff’s management that the government’s job site personnel were requiring anything not traceable to the faulty fabrication. The first time such an allegation was made was after the appeal (in No. 1709) had been filed and docketed by the Board. By then a corporation associated with plaintiff had acquired control of Higgins so that the interests of plaintiff and Higgins had become mutual. In that transaction, provision was made for settlement of the dispute relating to faulty fabrication of the lock gates between plaintiff and Higgins through payment by Higgins to plaintiff of $250,000.[8]
Against this background, we come now to the question as to whether under the contract final acceptance of the gates was to be at the place of production or at the job site. Pertinent in this connection are the following provisions of the contract and specifications:

General Provisions of the Contract

9. Inspection. — (a) Except as otherwise provided in paragraph (d) hereof all material and workmanship, if not otherwise designated by the specifications, shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Be-jected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the Con *899 tractor shall promptly segregate and remove the rejected material from the premises. * * * *
# * * #
(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and written or other formal acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract, damage or loss in transit, fraud, or such gross mistakes as. amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site. Nothing contained in this paragraph (d) shall in any way restrict the Government’s rights under any warranty or guarantee.
V ^ »j»

General Conditions of the Specifications

GC-19. Inspection. — The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract. As soon as practicable after the completion of the entire work, or any divisible part thereof as may be designated in these specifications, a thorough examination thereof will be made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted, and final payment therefor will be made in accordance with the article of the contract entitled “Payments to Contractors.”

Technicdl Provisions of the Specifications

TP 8-01. General. — The Contractor shall furnish, install, adjust and test two upper and two lower miter lock gates, each consisting of two horizontally framed *900 leaves and tbe appurtenant parts called for on the drawings. The gates shall be constructed as shown on the drawings and shall conform to the requirements of these specifications. Shop drawings shall be submitted for the 'approval of the Contracting Officer as required in Part III Special Conditions.
TP 8-02. Materials and Worlcmanship. — (a) General. All materials and workmanship shall be, in conformity with the requirements of Sections 13 and 14 wherever applicable and as further specified below * * * * * * * * *
TP 8-04. Erection. — (a) General. The gate as a whole shall be of welded construction, except for bolted accessories as shown on the drawings. Skin plate splices are not indicated on the drawings, but may be made symmetrically along the center line of any horizontal girder or vertical diaphragm. All such splices shall be clearly shown on the shop drawings, which shall be submitted to the Contracting Officer for approval.
(b) Shop Erection. Shop erection of completed gates is not contemplated. However, it is contemplated that as much shop welding of the members in their final positions shall be performed as delivery and field erection conditions will permit. Parts and members not assembled in the shop, including accessories, shall be carefully checked in the shop at the time of shipment to determine that all parts, members, and accessories as fabricated will assemble correctly in the field erection. The flanges of all framing members shall be in a true plane on the skin plate side of each leaf. The outside races of the skin plates shall not vary from a true surface by more than % inch. Such assembly work as may be performed in the shop shall be performed in the presence of the Government Inspector who will see that all dimensions are carefully maintained and that any errors or defects disclosed are promptly corrected without cost to the Government. The presence of the Inspector, however, shall in no way relieve the Contractor of any responsibility under his contract. Before disassembling parts of the gate in the shop for shipment to the site of the work, each piece or subassembly of the assembled gate parts shall be match marked to facilitate erection in the field. Necessary allowances shall be made in the construction and assembly of shop prefabricated members for shrinkage and distortion during the final welding of the structure, and all root openings and clearances shall be in accordance with the codes and speci *901 fications of the American Welding Society. The schedule of welding procedure, submitted for approval of the Contracting Officer, shall indicate clearly what part of the structure is to be shop welded and what part field welded, according to the proposed plan of fabrication and erection. Separate welding procedures for shop welding and for field welding shall be submitted for approval of the Contracting Officer. Parts damaged in shipment, handling or erection shall be repaired or replaced at no cost to the Government, as directed by the Contracting Officer.
(c) Field Erection. Prior to commencing field erection, the Contractor shall submit, in duplicate, for the approval of the Contracting Officer, a detailed description, with all necessary explanatory drawings, showing the method of erection he proposes to employ. The description shall include the method of delivering the parts or sub-assemblies of the gates to the site; the location and method of support of erection and handling equipment; the provisions to be taken to protect concrete and other work during erection; the method of maintaining the work in correct alignment; the plan of operations for prestressing the diagonals, the methods proposed for installing the seals, checking and maintaining alignment of the seals during the grouting and placement of the zinc filler, and the methods proposed for installing other appurtenant parts and accessories. The method of field erection shall be carefully coordinated with the field welding procedure for the structures. The field welding procedure and the erection procedure shall be submitted as separate distinct plans. Definite provisions shall be made to insure that no heavy erection and handling machinery units, such as cranes, derricks and hoists, are placed directly upon the concrete sills or walls without suitable approved grillage to distribute the loads. During erection, the utmost care shall be taken to insure that the prefabricated sections of the gate are in correct alignment before any weld on the skin plate splice is applied. All necessary precautions shall be taken to avoid distortion of the gate as a whole or any of its component parts. Special care shall be exercised during the progress of erection to guard against any sag of the miter end of the gate leaves due to compression of the blocking or from other causes. After the gates have been erected, the individual leaves shall be plumbed and brought into correct position by means of the turnbuckles of the gate diagonals, and the *902 adjusting wedge pins at the quoin end of each leaf. Additional requirements pertaining to field erection are specified in the following paragraph.
*****
TP 8-08. Trial Operation and Test. — After erection and before final acceptance, the Contracting Officer will examine the gates with the lock unwatered to determine whether or not the workmanship conforms to the specification requirements. The Contractor will be required to operate the gates from the fully open to the fully closed positions a sufficient number of times to demonstrate to the Contracting Officer that all parts are functioning properly. Any and all defects disclosed during the above examination and trial operation shall be corrected by the Contractor and the gates shall be tested for watertightness with a pressure hose using a minimum pressure of 60 pounds per square inch at the nozzle. Any defects disclosed shall be corrected by the Contractor at no cost to the Government, and a satisfactory retest shall be made. (Note: As amended by Addendum No. 2) * * * *
TP 8-09. Payment. — Payment for furnishing and installing the upper and lower lock gates complete will be made at the applicable contract price, Item No. 22. The contract price shall cover all costs of materials, fabrication, delivery and installation of the movable gate leaves, pintles, pintle castings, pintle bushings, seals, timber fenders, walkways, walkway grating, handrail-ing, all parts of the top anchorages not embedded in concrete, upper and lower strut pin castings, and the steamboat ratchets, and testing and painting of the gates, all as specified herein.
Pintle bases will be paid for separately as steel castings, Item No. 31. Gate anchorages to be embedded in concrete, wall quoin posts and anchors, quoin post contact blocks, and the metal work for gate latching devices will be paid for separately as miscellaneous metal work, Item No. 32.
:$« íjí ‡
TP 14-01. Scope. — This section specifies the workmanship standards applicable to the various phases of metalwork fabrication, the methods and precautions for erection of metal structures and machines, the general requirements for tests and trials on such structures and machines to insure conformance with the specifications, and miscellaneous requirements incident to the work.
*903 TP 14 — 13. Shop Inspection. — The Contractor shall keep the Contracting Officer informed as to commencement and progress of the work. The Contractor shall at all times permit Government inspectors free access to all parts of mills, foundries, and yards of shops where work is being carried on under the contract and shall provide the necessary facilities and assistance for making thorough examinations. The acceptance of any material or finished member by an inspector shall not prevent subsequent rejection if such material or member is later found to be defective.
Article 9(d) of the general provisions specified, in brief, that inspection at the place of production, wnless otherwise stated, in the specifications, would be final (with certain listed exceptions not presently relevant). It would seem that the specifications did provide otherwise and indicated that final acceptance of the gates was not to take place until after erection. Under the contract, the plaintiff agreed to “furnish and install lock gates” (a responsibility which, of course, was not lessened because plaintiff subcontracted part of the work). Viewed against this purpose, the specifications provided : That the plaintiff was obligated to furnish, install, adjust and test two upper and two lower miter lock gates (TP 8-01); that “After erection and before final acceptance, the Contracting Officer will examine the gates with the lock unwatered to determine whether or not the workmanship conforms to the specification requirements” (TP 8-08); that relative to shop inspection “The acceptance of any material or finished member by an inspector shall not prevent subsequent rejection if such material or member is later found to be defective” (TP 14-13);[9] and that “As soon as practicable *904 after the completion of the entire work, or any divisible part thereof as may be designated in these specifications, a thorough examination thereof will be made by the Contracting Officer at the site of the work * * * [and] [i]f such work is found to comply fully with the requirements of the contract, it will be accepted, and final payment therefor will be made. * * *” (GC-19). Further, the shop fabrication of the lock gates was not designated in the specifications as a divisible part of the work. It would seem, therefore, that considered as a whole the specifications as to final examination and acceptance contemplated a single acceptance upon overall completion of the work,[10] and hence there could be no final acceptance of component parts fabricated at plant locations until installed at the job site and there inspected and accepted. Nor did acceptance of the gates at the fabrication plant relieve plaintiff of responsibility for defects discovered before final acceptance. For under the specifications, the plant inspector was “not authorized to make final inspections and did not purport to do so.” J. C. Decker, Inc. v. United States, 117 Ct. Cl. 703, 714, 93 F. Supp. 631, 633 (1950). See also B. H. Deacon Co. v. United States, 189 F. Supp. 146, 149 (E.D. Pa., 1960); California Vegetable Growers v. United States, 194 F. 2d 929, 930-31 (9th Cir., 1952). In fact, the inspector told Higgins that he had no authority to make a final acceptance at the plant and that such acceptance would take place when the gates were erected at the job site.
Morover, plaintiff’s consistent actions and course of conduct demonstrate that it did not consider inspection at New Orleans as constituting final acceptance.[11] Thus, shortly after plaintiff entered into a purchase order with Higgins, the latter wrote plaintiff and requested that final acceptance of the gates be at its plant in New Orleans rather than at the job site. Plaintiff advised Higgins, however, that it believed the Corps of Engineers would not grant final acceptance until the gates were installed for operation. Further, *905 when Higgins made demand for final payment of the gates, plaintiff emphasized to it that the “Corps of Engineers approval can be only of the finished erected gates.” In short, before there was any controversy, plaintiff clearly recognized that final acceptance was not at New Orleans but would take place at the job site, and this interpretation of the contract— which is likewise the defendant’s interpretation — is entitled to great, if not controlling, weight. Chahroudi v. United States, 124 Ct. Cl. 792, 797-98 (1953), and cases there cited.
It is significant too that after the gates were shipped to the work site and plaintiff was required by the government to perform the corrective work, it made no protest whatever, but instead placed responsibility for the faulty work on its fabrication subcontractor and made arrangements with its erector subcontractor to perform the necessary remedial work. It is also significant that at no time during the course of the corrective work did plaintiff indicate by protest or otherwise that the work was extra work not required by the contract on the basis that the gates had been finally accepted at New Orleans. Plaintiff’s failure in these circumstances to make any protest whatsoever about performing the corrective work without additional compensation would seem strong indication that it did not consider acceptance at New Orleans as final. See J. A. Ross & Company v. United States, 126 Ct. Cl. 323, 329-30, 115 F. Supp. 187, 190-91 (1953). The further fact that plaintiff and Higgins became involved in a dispute as to who was to bear the cost of the corrective work and that Higgins agreed to pay $250,000 to plaintiff as a result of faulty fabrication of the gates provides additional indication that both plaintiff and Higgins considered that there was no final acceptance of the gates at New Orleans. In short, plaintiff’s conduct from beginning to end evidenced that it did not regard acceptance at New Orleans as final but rather considered that final acceptance under the contract would take place at the job site.[12]
266-320 — 67-59
*906 Plaintiff insists, however, that the acceptance at New Orleans is “binding” by reason of Section 14.102 of the Armed Services Procurement Regulations which during the period involved here provided in part (32 C.F.R. (Rev. 1954) Part 14 § 14.102) :
Inspection or the arrangement therefor, is the responsibility of the procuring activity effecting the procurement. Where a Department or activity utilizes the inspection services of another Department or activity, the Department or activity performing such inspection.has primary inspection cognizance and its determinations relative thereto are binding on the Department or activity for which such inspection services are performed. * * *
The manifest purpose of this provision, it would seem clear, is to insure that when an inspection is conducted by another government department or activity for the contracting activity, its inspection results will be accorded precisely the same status as if the inspection had been conducted by the contracting activity itself. Thus it is in this context that the inspection at New Orleans was “binding” on the contracting activity. This does not mean, however, that the inspection of another activity is to be accorded greater effect under the regulation than an inspection conducted by the contracting activity itself. Such an interpretation would not only be a strained one indeed, it would result in the anomalous *907 situation (for example) that even though the contract specified that inspection and acceptance at the source were not to be final, finality would nevertheless attach thereto simply because the inspection was made on behalf of the contracting activity rather than by the contracting activity itself. Nothing in the regulation reasonably read contemplates such a result.
In sum, it is concluded that the contract read as a whole establishes that final acceptance of the gates was to be at the job site and not at the fabrication plant. Moreover, the record before the Board overwhelmingly supports the Board’s finding that the corrective work required to be performed was necessary to correct deficiencies in fabrication. The record is replete with evidence of the defective nature of the gates; their noncompliance with the specifications;[13] and the extensive corrective work necessary to make them conform to plans and specifications. Indeed, plaintiff could not cite one instance where the corrective work went beyond specification requirements.[14]
For the reasons stated, plaintiff is not entitled to recover and its petition must be dismissed.
CONCLUSION OP LAW
Upon the foregoing opinion, which includes therein the findings of fact made by the court based on the administrative record as a part of its judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and, therefore, its petition is dismissed.

The opinion and recommended conclusion of law are submitted pursuant to the order of tbe court under Rule 57(a). The facts are stated in the opinion.

 Article 5(c) allowed an extension of time “because of any delays In tlie completion of the work due to causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, * * * acts of the Government, in either its sovereign or contractual capacity * *

 The parties stipulated that the Board (in No. 2223) was to determine the appeal on the basis of the record before the Board in the earlier appeal (No. 1709).

 In view of this conclusion, the Board considered it unnecessary to reach a further point urged by the government that Article 9(d) never came into play at New Orleans but was operative at the job site after the gates were erected.

 Tlie facts contained Rere are derived essentially from the unchallenged factual findings set out by the Board in No. 1709.

 The present plaintiff subsequently succeeded to the rights and obligations of the Savin Construction Corporation. The term “plaintiff” will be used hereafter to refer to both that corporation and the named plaintiff without differentiation.

 More specifically, each of the gates was shipped in the form of fabricated sections and component parts that were to be assembled at the job site. For convenience, however, the term “gates,” as used in this opinion refers generally to the fabricated sections and component parts.

 In addition, the testimony of the Corps of Engineers representatives before the Board makes it clear that they understood the import of the execution of these forms, i.e., that the gates had been inspected and found acceptable in New Orleans. See e.g., transcript Washington hearings, pp. 163-64, 418-19. See also Gov’t Ex. 20.

 Higgins’ president testified before the Board that this settlement did not evidence an admission of fault by Higgins since he agreed to the settlement only as a part of the transfer of the Higgins’ interest to plaintiff’s associate. The Board noted that the “testimony of Higgins’ personnel, coupled with that of Mr. Jackson in support of his fabrication inspection as to the condition of the gates when they left New Orleans, does not dispel the admission inherent in the conduct of * * * [plaintiff’s] management while the work was in progress that that work was actually necessary to correct defects.”

 Plaintiff observes that the acceptance clause of the contract (9(d)) refers to “finished articles”, whereas TP 14-13 refers to a “finished member”, and contends that TP 14-13 is not applicable here on the ground that a “finished member” is not a “finished article” but rather is an item such as an H-beam or a steel plate which is produced in a steel mill or foundry and is later incorporated into a “finished articlé.” Thus, plaintiff maintains that TP 14-13 is intended to refer to the first step, i.e., the formation of materials and finished members, and is not intended to apply to the second step, i.e., the fabrication or manufacture of “finished articles.” Not only does this argument appear quite strained, even under plaintiff’s view of the meaning of the above terms, the gates in question, in the circumstances of this case, would seem to fall in the category of “finished members” rather than “finished articles” considering (as the parties contemplated) that what were shipped from the plant were not individually finished gates as such but rather fabricated sections and component parts for each of the gates so that further and substantial assembly work was required at the job site before any finished gate was constituted.

 See De Armas v. United States, 108 Ct. Cl. 436, 468, 70 P. Supp. 605, 606 (1947).

 The actions and conduct of the parties in performing a contract are, of course, highly relevant in interpreting a contract. See e.g., Universal Match Corporation v. United States, 161 Ct. Cl. 418, 422 (1963), and eases cited in fn. 4; Williston, Contracts (3d ed.) § 623.

 Plaintiff relies heavily on Gordon B. Ball, Inc., ASBCA No. 8316, 1963 BCA 19,467. In that case the government failed to perform X-ray examination of steel columns at a fabrication plant as contemplated by the contract but released them to the job site after it had accepted them. Thereafter, the government required the contractor to provide facilities for an on-site X-ray inspection of the columns by the government and to repair welds in the columns to correct defects disclosed by such examination. The contractor *906 sought an equitable adjustment under the Changes clause contending that the government had “accepted” the columns and that by virtue of Article 9(d) (which was identical with 9(d) in the present case) the government had lost its right under the contract specifications to perform X-ray examinations and to require it to repair the defective welds. The Board sustained the appeal holding that the contractor had the right to assume and base its bid price on the expectation that the government would perform the X-ray inspection in the time and manner provided by the contract. The government (the Board stated) did not have the right to subject the contractor to increased performance costs by deferring X-ray inspections to a later time. The holding thus appears to be predicated on the fact that the contractor was entitled to rely on'the specification agreement that the government would conduct an X-ray inspection at the plant. The Board, however, went on to point out that acceptance of the kind contemplated by Article 9(d) was made at the plant and finality therefore attached. As to this, the case would seem entirely distinguishable. Nor one thing, although the contract involved in Ball contained an Article 9 (d) identical with the one here, the specifications differed considerably. Further, it does not appear that the specifications involved in Ball contained provisions in any wise similar to TP 8-01, TP 8-08 or TP 14-13. Nor in Ball, unlike the present case, did the parties through their conduct and action consider that final acceptance would take place at the job site rather than at the fabrication plant.

 There is no real dispute as to the failure of the gates to meet plans and specifications. Thus, plaintiff states in its main brief here (p. 32) : “That the gates contained deviations from the plans and specifications is not denied.”

 In view of these conclusions, it is unnecessary to reach the question as to whether the Board was correct in its interpretation of the exceptive phrase in Article 9(d) “departures from specific requirements of the contract” or to pass upon the other contentions urged by plaintiff.